Mr. Chief Justice ShaRKey
delivered the opinion of the court.
The appellants filed exceptions in the probate court to the report of sales of the personal property of Josiah Willis, deceased, on the ground of fraud committed by the defendants in error in making the sale. Mrs. Moreland was the wife of Willis, and after his death intermarried with Moreland. They reported the estate insolvent, and obtained an order of sale, and proceeded to sell the slaves at very low prices, not one-third of their value, to Mary Seybourne, a sister of Mrs. Moreland, and an inmate of the family.
To establish the fraud the plaintiffs introduced the appraisement, and a report made by the administrators to the probate court, showing the liabilities of the estate to amount to $14,504, which also valued the assets, principally slaves, at $9,110, which report constituted the foundation of the application to sell the property, and was made under oath. Several witnesses were also examined to show the manner in which the sale was conducted, together with the conduct of the administrators in regard to certain debts due from the estate.
The existence of fraud must generally be gathered from cir-cumstanlial proof, as it is usually perpetrated in such a manner as to exclude the possibility of establishing it by positive proof. The circumstances in this case are such as lead irresistibly to the conclusion that the administrators were acting in bad faith to the creditors, by having the property sold under its value, with a view to their own benefit, or for the benefit of a confi *618 dential friend. It is the paramount duty of an administrator to protect the interests of'creditors by using every effort to make the property under his charge sell for the best price. Creditors have the first claims upon it, and the law and his oath of office, both require that he should administer in good faith. He cannot purchase at his own sale, either directly or indirectly ; nor can he sell under a secret trust, or private understanding that he is to have an interest in the property,, or to derive a benefit from the sale. He cannot use or dispose of the trust property for his own benefit, or for the benefit of his private friends. It is devoted by law to particular purposes, and it is a breach of trust in the administrator to permit counteracting interests to divert it from its legitimate destination, or to diminish its value. Planters Bank v. Neely, 7 How. 80; Michoud v. Girord, 4 How. S. C. R. 503.
In the first place by this controversy the administrators are insisting that the report of sale shall be approved and confirmed, when it is obvious that the property did not bring more than a third of its value, as established by the appraisement, by their own report under oath, and by the testimony of witnesses, when too the purchaser is a sister of one, a sister-in-law of the other, and a member of the family. A strict regard for the rights of creditors should induce a desire on the part of the administrator to have a sale of property at prices so greatly under its value, set aside. But an opposite desire seems to prevail with these administrators, and, under the circumstances, this alone is calculated to create doubts whether they did not permit their private interests to have an undue weight in making the sale.
But the testimony of the witnesses is still more conclusive on this subject. Henry O’Kelly attended the sale as the agent of his brother, who was a creditor, with instructions to make the property bring its value, or to secure the debt’ of O’Kelly. He arrived about half an hour before the sale, which commenced about five minutes after, twelve o’clock, when but three persons besides the witness were present. The witness bid $1000 for the first lot of negroes put up, consisting of five in number; Mary Seybourne bid one dollar more and was declared the pur *619 chaser. The bid made by O’Kelly seemed to create great surprise amongst the persons present, and before another lot was offered the witness received a proposition through John T. Moore that his brother’s debt should be settled, to which he acceded, and which was accordingly done during the day, to the full amount, by the joint note of Mary Seybourne and J. T. Moore. He did not know that Mary Seybourne knew this proposition had been made. The rest of the negroes were then put up in lots, and sold at prices greatly below their value, the auctioneer dwelling but a short time on the bids, as but few persons were present, though sufficiently long to have enabled the persons present to bid.
James T. Marye went, to the sale in company with O’Kelly, and went for the purpose of purchasing negroes. He asked More-land if the family wished to buy the property, and was answered that Mary Seybourne expected to purchase it; the witness then said he would not bid, and accordingly did not, nor did any other person except O’Kelly and Mary Seybourne. The witness stated to the persons present at the sale that there were several gentlemen coming out from Port Gibson to bid for the property, and would be there very soon. Moreland asked if it was twelve o’clock, and on being informed that it was, directed the auctioneer to proceed, which he did, and sold the negroes before the bidders arrived, which they did at about half past twelve o’clock. Mary Seybourne was crying during the sale, and appeared much affected when O’Kelly bid. She purchased all the property'-, which did not bring more than one-third of its value.
It seems also that A. W. Putnam had a claim against the estate of Willis for a sum of money on which a suit was pending. He had also brought an action of ejectment against Moreland and wife for a tract of land, which had been sold to Putnam’s testator, for which the money claimed had been paid, but the title had been acquired from another source, as it was not in Willis when he sold. As a creditor he had filed exceptions to the confirmation of the report, in order that the property might be resold for its value. But shortly before the exceptions were to be *620 tried, he compromised the\vhole matter with Moreland, and received the joint note of Mary Seybonrne and John T. Moore for the amount of money which had been 'paid on the purchase of the land, and thereupon withdrew his exceptions to the report.
The testimony of J. B. Thrasher, is still more conclusive, in showing the motives and plan of Moreland. As counsel, he prepared the report of insolvency, and gave general instructions as to the mode of conducting the sale. He afterwards learned that Moreland expected him to buy the property, and hold it until he (Moreland) could pay for it, and for his benefit. On an interview with Moreland, Mr. Thrasher undeceived him, by informing him that he would not buy the property. He at the same time told Moreland that the negroes would have to sell for their full value,' as several persons in town, who had money, wished to buy such property, and would attend the sale. To this, Moreland replied that he did not think any one would bid for the negroes against the children, or against him; that he wished and expected to buy them very low. The witness knew some of the negroes, and would have purchased one of them, (Tom,) at six hundred dollars, but, in consequence of Moreland’s declarations, did not attend the sale. Mrs. More-land had met him the day before in the street, and expressed great surprise and regret that he should appear against them, as she did not wish the sale set aside.
This testimony shows, beyond a reasonable doubt, that the administrators were not acting in good faith towards creditors, and that they had concocted a plan by which the property should be sold for a trifle, and bought in for their benefit. The facts will justify no other conclusion. When O’Kelly manifested a determination to bid, he was soo.n given to understand that his debt would be settled, which was done to the full amount, although the estate, at a fair valuation, was not able to pay more than two-thirds of the amount. Can it be believed that the administrators were ignorant of this arrangement1? Why did the administrator press the sale, by directing the auctioneer to proceed, when he had been informed that other bidders were coming, and would soon be there 1 A due regard for *621 the interests of creditors should have induced him to delay until they arrived. His duty demanded delay, but his interest required expedition, and prevailed. Why was Putnam’s claim compromised, and his objections to the sale consequently withdrawn? The compromise was made with Moreland, but he' did not give his note; Mary Seybourne and John T. Moore gave theirs, as they had done to O’Kelly. Bu t Moreland had furnished the key which unlocks this mystery, by his declaration to Thrasher. He did not think any one would bid against the children, or against him, and he expected to purchase the property very low. Mary Seybourne, however, who was one of his family, was substituted in his place, as the purchaser. He told, in advance, that she intended to buy it. This declaration was made to a witness, who had gone there for the purpose of bidding, but who said he would not bid if the family wished, to buy the property. Instead of inviting bidders, he kept them away from the sale, and so managed as to keep those persons from bidding who had attended for that purpose. Sales so made are fraudulent, in fact and in law, and it is the duty, as it is the province, of the probate court to set them aside, and order the property to be resold.
But it has been insisted that the judgment must be affirmed, because the sale could not be set aside, in the probate court, without making the purchaser a party, which she was not, as no notice was given her of the proceedings in that court. If for this reason no judgment could have been given against her, it is certainly not a good reason why judgment should have been given in her favor, when the facts did not entitle her to judgment. If notice was necessary, the court should have suspended the proceedings until it could have been given. On the authority of the Planters Bank v. Neely, 7 Howard, 80, the judgment must be reversed, and the sale set aside.